RECEIVED
OCTOBER 17, 2025
U.S. Court of Appeals
Eighth Circuit – St. Paul, MN

No. 25-3091

FILED
OCTOBER 17, 2025
U.S. Court of Appeals
Eighth Circuit – St. Paul, MN

IN THE

# United States Court of Appeals
# for the Eighth Circuit

———————

IN RE AGRI STATS, INC.; CLEMENS FOOD GROUP, LLC;
THE CLEMENS FAMILY CORPORATION; SEABOARD FOODS LLC;
SMITHFIELD FOODS, INC.; TRIUMPH FOODS, LLC; TYSON FOODS, INC.;
TYSON PREPARED FOODS, INC.; AND TYSON FRESH MEATS, INC.,
*Petitioners*

———————

On Petition for a Writ of Mandamus to the United States District Court
for the District of Minnesota, Case No. 0:18-cv-1776-JRT-JFD,
The Honorable John R. Tunheim

———————

## PETITION FOR A WRIT OF MANDAMUS
———————

## PUBLIC VERSION—SEALED MATERIAL REDACTED

WILLIAM L. MONTS III
JUSTIN W. BERNICK
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Counsel for Agri Stats, Inc.*

(additional parties and counsel on inside cover)

October 16, 2025

DANIEL LAYTIN, P.C.
CHRISTA COTTRELL, P.C.
JENNA STUPAR
NICHOLAS M. RUGE
AMARTO BHATTACHARYYA
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 861-2000

*Counsel for Clemens Food Group, LLC and The Clemens Family Corporation*

PETER J. SCHWINGLER
KELLY HOLT RODRIGUEZ
TESS L. ERICKSON
JONES DAY
90 South Seventh Street,
Suite 4950
Minneapolis, MN 55402
(612) 217-8866

WILLIAM L. GREENE
WILLIAM D. THOMSON
STINSON LLP
50 South Sixth Street,
Suite 2600
Minneapolis, MN 55402

J. NICCI WARR
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105

*Counsel for Seaboard Foods LLC*

BRIAN ROBISON
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
(972) 707-1809

JOHN A. COTTER
JOHN A. KVINGE
LARKIN HOFFMAN DALY & LINDGREN LTD.
8300 Norman Center Drive,
Suite 1000
Minneapolis, MN 55427-1060

RICHARD PARKER
MILBANK LLP
1101 New York Ave, NW
Washington, DC 20005

JOSH LIPTON
GIBSON, DUNN & CRUTCHER, LLP
1700 M Street, NW
Washington, DC 20036

*Counsel for Smithfield Foods, Inc.*

MICHAEL T. RAUPP
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000

CHRISTOPHER A. SMITH
JASON HUSGEN
HUSCH BLACKWELL LLP
8001 Forsyth Blvd., Suite 1500
St. Louis, MO 63105

A. JAMES SPUNG
HUSCH BLACKWELL LLP
1801 Wewatta Ave., Suite 1000
Denver, CO 80202

DANIEL G. SOLOMON
HUSCH BLACKWELL LLP
1801 Pennsylvania Ave., NW,
Suite 1000
Washington, DC 20006

*Counsel for Triumph Foods, LLC*

TIFFANY RIDER ROHRBAUGH
MARY HELEN WIMBERLY
LINDSEY STRANG ABERG
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700

DENISE L. PLUNKETT
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111

JAROD TAYLOR
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103

SCOTT M. RUSERT
A. CHRISTOPHER BROWN
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2210

*Counsel for Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; and Tyson Fresh Meats, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. Rule 26.1 and Eighth Circuit Local Rule 26.1A, Petitioners make these corporate disclosures:

Agri Stats, Inc. is a wholly owned subsidiary of Agri Stats Omega Holding Co. LLC. Agri Stats Omega Holding Co. LLC is a privately held domestic limited liability company. No publicly held company owns more than 10% of Agri Stats, Inc. or Agri Stats Omega Holding Co. LLC.

Clemens Food Group, LLC's parent corporation is The Clemens Family Corporation, and no publicly held corporation owns 10% or more of its stock. The Clemens Family Corporation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Seaboard Foods LLC is a wholly owned subsidiary of Seaboard Corporation, which is a publicly traded company. No other parent corporation or publicly held corporation owns a membership interest in Seaboard Foods.

Smithfield Foods, Inc. is publicly traded on the Nasdaq Global Select Market. Its ultimate parent company is WH Group Limited, which is a publicly traded company listed on the Hong Kong Stock Exchange that

i

is the indirect owner of more than 10% of Smithfield Foods, Inc.'s outstanding shares.

Triumph Foods LLC is a limited liability company. Triumph is not a corporation, it has no parent company and no publicly held corporation owns 10% or more of its stock.

Tyson Prepared Foods, Inc. is a wholly owned subsidiary of Tyson Foods, Inc. Tyson Fresh Meats, Inc. is a wholly owned subsidiary of Tyson Foods, Inc. Tyson Foods, Inc. is a publicly held corporation and does not have a parent corporation. No publicly held corporation owns 10% or more of Tyson Foods, Inc.'s stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF CONTENTS ...................................................... iii

TABLE OF AUTHORITIES.....................................................v

INTRODUCTION ........................................................... 1

RELIEF SOUGHT ......................................................... 6

ISSUES PRESENTED ...................................................... 6

STATEMENT OF FACTS AND THE CASE...........................................7

    A.    The Agri Stats Cases ...................................... 7

    B.    The Law Clerk's Work Experience and Social Media Activity................................................. 9

    C.    The *Daubert* and Summary Judgment Rulings .......... 12

    D.    The District Court Discloses the Law Clerk's Involvement After Issuing the *Daubert* and Summary Judgment Orders........................................ 13

    E.    The District Court Denies Petitioners' Motion for Recusal .................................................. 14

REASONS WHY THE WRIT SHOULD ISSUE .................................... 16

I.    PETITIONERS HAVE A CLEAR AND INDISPUTABLE RIGHT TO THE WRIT ........................... 17

    A.    The District Court Legally Erred and Clearly Abused Its Discretion in Finding that the Clerk's Substantive Participation in This Case Does Not Give Rise to an Appearance of Partiality ................... 18

Appellate Case: 25-3091     Page: 5     Date Filed: 10/17/2025 Entry ID: 5570117

B. The District Court Legally Erred and Clearly Abused Its Discretion by Concluding that Any Clerk Conflict Could Not Be Imputed to the Court.....25

C. The District Court's Failure to Disclose the Potential Conflicts Promptly Also Gives Rise to an Appearance of Partiality .........................................26

II. PETITIONERS HAVE NO OTHER ADEQUATE MEANS TO ATTAIN THE RELIEF FROM THE APPEARANCE OF PARTIALITY.........................................28

III. A WRIT IS APPROPRIATE UNDER THE CIRCUMSTANCES ..............................................31

IV. THE DISTRICT COURT CLEARLY ABUSED ITS DISCRETION IN REFUSING TO RECUSE AND VACATE THE *DAUBERT* AND SUMMARY JUDGMENT ORDERS .........................................31

CONCLUSION ......................................................................36

CERTIFICATE OF COMPLIANCE ........................................40

CERTIFICATE OF SERVICE................................................41

iv

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Abelesz v. OTP Bank,*
692 F.3d 638 (7th Cir. 2012) ........................................... 30

*In re Al-Nashiri,*
921 F.3d 224 (D.C. Cir. 2019) .............................. 18, 28, 29

*Alexander v. Primerica Holdings, Inc.,*
10 F.3d 155 (3d Cir. 1993) ............................................... 29

*In re Apple, Inc.,*
602 F.3d 909 ........................................................... 1, 16

*In re BankAmerica Corp. Sec. Litig.,*
270 F.3d 639 (8th Cir. 2001) ........................................... 16

*In re Bergeron,*
636 F.3d 882 (7th Cir. 2011) ........................................... 29

*In re Borowiak IGA Foodliner, Inc.,*
879 F.3d 848 (8th Cir. 2018) ........................................... 31

*In re Brazile,*
993 F.3d 593 (8th Cir. 2021) ...................................... 17, 28

*In re Broiler Chicken Antitrust Litig.,*
No. 1:16-cv-08637 (N.D. Ill.) ............................................. 7

*In re Broiler Chicken Grower Litig. No. II,*
No. 6:20-md-02977 (E.D. Okla.) ........................................ 10

*In re Brooks,*
383 F.3d 1036 (D.C. Cir. 2004) ......................................... 29

*Caperton v. A.T. Massey Coal Co.,*
556 U.S. 868 (2009) ......................................................... 33

*In re Cattle & Beef Antitrust Litig.,*
No. 22-md-3031 (D. Minn.) ......................................... 9, 10

*Cheney v. U.S. Dist. Ct. for D.C.,*
542 U.S. 367 (2004) ................................................. 2, 16, 31

*City of Duluth v. Fond du Lac Band of Lake Superior Chippewa,*
702 F.3d 1147 (8th Cir. 2013) .......................................... 17

v

*Cochran v. SEC*,
  20 F.4th 194 (5th Cir. 2021) ............................................................ 29

*In re Int'l Bus. Machs. Corp.*,
  618 F.2d 923 (2d Cir. 1980) ............................................................ 31

*In re Creech*,
  119 F.4th 1114 (9th Cir. 2024) .................................................... 28, 29

*First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*,
  210 F.3d 983 (9th Cir. 2000) ........................................................... 27

*Gardiner v. A.H. Robins Co.*,
  747 F.2d 1180 (8th Cir. 1984) .......................................................... 24

*Hall v. Small Bus. Admin.*,
  695 F.2d 175 (5th Cir. 1983) ................................................. 25, 32, 33

*In re Hawsawi*,
  955 F.3d 152 (D.C. Cir. 2020) .......................................................... 27

*In re Int'l Bus. Machines Corp.*,
  45 F.3d 641 (2d Cir. 1995) ................................................................ 1

*Jien v. Perdue Farms, Inc.*,
  No. 1:19-cv-02521 (D. Md.) ............................................................. 10

*In re Kan. Pub. Emps. Ret. Sys.*,
  85 F.3d 1353 (8th Cir. 1996) ..................................................... 17, 28

*In re Kensington Int'l Ltd.*,
  368 F.3d 289 (3d Cir. 2004) ............................................................. 25

*In re Landry*,
  83 F.4th 300 (5th Cir. 2023) ........................................................... 30

*Liddell v. Bd. of Ed. of City of St. Louis*,
  677 F.2d 626 (8th Cir. 1982) ..................................................... 28, 31

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847 (1988) ............................................................... *passim*

*Liteky v. United States*,
  510 U.S. 540 (1994) ....................................................................... 18

*Litovich v. Bank of Am. Corp.*,
  106 F.4th 218 (2d Cir. 2024) .................................................. 32, 33, 35

vi

*Manuel v. City of Joliet*,
580 U.S. 357 (2017).............................................................27

*Mathis v. Huff & Puff Trucking, Inc.*,
787 F.3d 1297..............................................................4, 25

*Matter of Rhone-Poulenc Rorer, Inc.*,
51 F.3d 1293 (7th Cir. 1995) ...........................................30

*In re Mo. Dep't of Corr.*,
839 F.3d 732 (8th Cir. 2016) ...........................................31

*Moran v. Clarke*,
296 F.3d 638 (8th Cir. 2002) ...........................................27

*O'Bannon v. Union Pac. R. Co.*,
169 F.3d 1088 (8th Cir. 1999) .........................................33

*Parker v. Connors Steel Co.*,
855 F.2d 1510 (11th Cir. 1988) .......................................26

*Peterson v. Agri Stats, Inc.*,
2019 No. 0:19-cv-01129 (D. Minn. 2019) ...........................9

*Pfizer Inc. v. Lord*,
456 F.2d 532 (8th Cir. 1972) ......................................28, 31

*In re Pork Antitrust Litig.*,
781 F. Supp. 3d 758 (D. Minn. 2025) ...............................13

*In re Pork Antitrust Litig.*,
2025 WL 965367 (D. Minn. Mar. 31, 2025) ......................13

*Shell Oil Co. v. United States*,
672 F.3d 1283 (Fed. Cir. 2012)........................................34

*Trammel v. Simmons First Bank of Searcy*,
345 F.3d 611 (8th Cir. 2003) ......................................24, 36

*In re Turkey Antitrust Litig.*,
No. 1:19-cv-08318 (N.D. Ill.)...............................................7

*United States v. Agri Stats, Inc.*,
2024 WL 2728450 (D. Minn. May 28, 2024) .......................9

*United States v. Agri Stats, Inc.*,
2024 WL 3061570 (D. Minn. May 17, 2024) .......................8

Appellate Case: 25-3091    Page: 9    Date Filed: 10/17/2025 Entry ID: 5570117

*United States v. Brocato*,
    4 F.4th 296 (5th Cir. 2021) .......................................................... 26

*United States v. Martinez*,
    446 F.3d 878 (8th Cir. 2006) ................................................... 24, 36

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ....................................................... 24

*United States v. Mims*,
    122 F.4th 1021 (8th Cir. 2024) ................................................... 17

*United States v. Oaks*,
    606 F.3d 536 ................................................................ 1, 2, 18, 20

*In re United States*,
    666 F.2d 690 (1st Cir. 1981) ....................................................... 30

*Wersal v. Sexton*,
    674 F.3d 1010 (8th Cir. 2012) ..................................................... 34

*Williams v. Pennsylvania*,
    579 U.S. 1 (2016) ...................................................................... 35

**Federal Statutes**

28 U.S.C. § 455 ....................................................................... 1, 6, 14, 18

**Federal Rules**

Fed. R. App. P.

    Rule 21 .................................................................................. 40

    Rule 32 .................................................................................. 40

**Other Authorities**

*Conduct*, Law360 (April 29, 2025), https://bit.ly/4j0xiuA ...................... 35

*Fixing Judge Rejects Recusal Bid As Insincere*, Law360 (Oct. 7, 2025),
    https://www.law360.com/articles/2351516 ...................................... 35

Katie Arcieri, *Judge Rejects Recusal Bid Over Clerk Courtroom Hug
    in Pork Case*, Bloomberg Law (Oct. 7, 2025),
    https://tinyurl.com/6e435225 ....................................................... 35

## INTRODUCTION

Federal law imposes a mandatory recusal standard. A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A court must apply "an objective standard of reasonableness in determining whether recusal is required." *United States v. Oaks*, 606 F.3d 530, 536 (8th Cir. 2010). And if the court does not, and it is "manifestly clear that a reasonable observer would question the Judge's impartiality," then, as the Second Circuit has held, it is "indisputable that mandamus is warranted." *In re Int'l Bus. Machines Corp.*, 45 F.3d 641, 644 (2d Cir. 1995).

The judge below assigned this case to a law clerk who had previously worked for a state attorney general's office on an enforcement action in a related case, for a law firm representing Respondents, *and* for another firm representing plaintiffs in a closely related case. Yet in denying Petitioners' recusal motion, the district court found no appearance of partiality because the clerk "did not have a clear appearance of bias," and "even if the clerk had an appearance of bias, such bias should not be imputed to the court." A67. That was legal error and constitutes the type of "'clear abuse of discretion'" that compels mandamus relief. *In re Apple,*

1

*Inc.*, 602 F.3d 909, 911 (8th Cir. 2010) (per curiam) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)).

*First*, the district court concluded that the law clerk had no clear appearance of bias—but only by departing from the governing "objective standard of reasonableness [for] determining whether recusal is required." *Oaks*, 606 F.3d at 536. The court transformed an objective assessment of the appearance of bias based on all relevant circumstances into a subjective inquiry about existence of actual bias based on selective facts.

To the district court, it did not matter that the law clerk had previously worked for a state attorney general's office on an enforcement action in what the court had held to be a related case challenging the same alleged conspiracy among the same entities—or that the court had screened the clerk from working on *that* enforcement action from the start. The district court dismissed these critical facts categorically as "[w]ork for [n]on-[p]arties." A68. It did not matter that the clerk previously worked for a law firm representing Respondents and for another firm representing plaintiffs in a closely related case—because "he was a law student at the time and was not licensed to practice law." A71. It did

2

not matter that the court had screened the clerk from *future* work on this case in April 2025 ██████████████████████████████████████████ ████████████ A25, because the real reason for the screen was instead to "shield the law clerk from further intrusive investigations and allegations of impropriety," A72. And, even after all of that, it did not matter that the clerk publicly posted about his ████████████████████████ ██████ A34, or that he celebrated posts on social media about his former employers' litigation successes in related cases because "the liking or celebration of posts indicates merely that the law clerk continued to acknowledge and celebrate his classmates' and colleagues' successes." A69-70.

This ruling cannot stand. The law clerk may have been "outstanding" and "highly professional" throughout his clerkship, A72, but those qualities are not at issue. The problem here—and the reason mandamus should be granted—is that the district court chose to have the clerk work on a case despite his appearance of partiality. And, in any event, the court's subjective observations cannot override an objective assessment of how its handling of the clerk's appearance of bias would appear to a reasonable observer. Under the correct standard, Petitioners' right to

3

relief is clear, and the court's endorsement of the clerk's participation in this case undermines the standard for the appearance of impartiality well beyond this case—including for future clerks put in a similar situation.

*Second*, the district judge's determination that any bias of his law clerk could not be imputed to the court departs from established case law recognizing that, "[i]f a law clerk continues to work on the case in which his or her impartiality might reasonably be questioned, . . . the clerk's actual or potential conflict may be imputed to the judge." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015). Such was the case here. Petitioners first raised the clerk's potential conflicts with the court when they learned of them in December 2024, which was before the court's rulings on the *Daubert* motions on which the clerk worked and the summary judgment motions, which rely on the expert opinions that the *Daubert* motions addressed. Not until almost four months later—in April 2025 and after ruling on the *Daubert* and summary judgment motions—did the court screen the clerk from the case going forward. That was too late. The bell could not be unrung.

4

The district court's justifications for its conclusion demonstrate the threat of leaving its decision standing. Although "judges, not law clerks, make decisions," A73 (citation omitted), that truism ignores that law clerks play an integral role—indeed, the assumption that they do is inherent in the *Code of Conduct for Judicial Employees*. While "[i]ndividual judges must enjoy considerable independence in deciding precisely how to use their law clerks," a judge may not keep a clerk assigned to a case when he has an appearance of bias simply because "the judge's other clerks are unavailable." *Id.* (citation omitted). The court's contrary view elevates expediency over the public trust in the judiciary, which federal law's mandatory recusal rules make paramount.

The district court's error must be corrected now. It is manifestly clear that a reasonable observer would question the court's impartiality. The court's related failure to vacate substantive rulings tainted by the clerk's conflict demands an immediate remedy—one that would not be forthcoming through the normal appeals process. Without this relief, the risk of injustice to the parties here and in related cases, and the risk of undermining the public's confidence in the judicial process, is substantial. Accordingly, the petition should be granted.

Appellate Case: 25-3091    Page: 15    Date Filed: 10/17/2025 Entry ID: 5570117

## RELIEF SOUGHT

Petitioners Agri Stats, Inc.; Clemens Food Group, LLC; The Clemens Family Corporation; Seaboard Foods LLC; Smithfield Foods, Inc.; Triumph Foods, LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; and Tyson Fresh Meats, Inc. respectfully request that this Court grant a writ of mandamus, direct The Honorable Judge John R. Tunheim to recuse himself from this case, vacate the *Daubert* and summary judgment orders, and reassign the motions for *de novo* consideration by a new district judge.

## ISSUES PRESENTED

1.     Whether Petitioners are entitled to a writ of mandamus because the district court clearly and indisputably committed legal error or otherwise abused its discretion in denying Petitioners' motion for recusal under 28 U.S.C. § 455(a).

2.     Whether the tainted *Daubert* and summary judgment orders should be vacated and the case reassigned to a different district judge.

6

## STATEMENT OF FACTS AND THE CASE

### A.    The Agri Stats Cases.

This multidistrict litigation is one of several cases challenging the use of Agri Stats, a third-party benchmarking service that collects information and publishes aggregated, anonymized reports for broiler-chicken processors and formerly did so for pork and turkey processors. Here, like its sister cases, Respondents allege that various pork producers violated antitrust law by exchanging information through Agri Stats to facilitate an unlawful agreement to constrict the supply of pork products and raise prices. This lawsuit is a companion to two other private lawsuits alleging similar claims against broiler-chicken and turkey processors. *See In re Broiler Chicken Antitrust Litig.*, No. 1:16-cv-08637 (N.D. Ill.) ("*Broilers*"); *In re Turkey Antitrust Litig.*, No. 1:19-cv-08318 (N.D. Ill.) ("*Turkey*").

All three lawsuits put forward the same basic theory of anticompetitive conduct: purported restriction of supply to increase protein prices facilitated by information exchanged through Agri Stats.[1] Not surprisingly, this case and *Broilers* share between them ten firms representing

---

[1] *Compare, e.g.*, *Broilers* Direct Purchaser Pls.' ("DPPs") Second Am. Compl. ¶ 11, ECF 212, *with Pork* DPPs' Third Am. Compl. ¶ 7, ECF431, *and Turkey* Third Am. Class Action Compl. ¶ 48, ECF 713.

Appellate Case: 25-3091    Page: 17    Date Filed: 10/17/2025 Entry ID: 5570117

plaintiffs, five plaintiffs' experts, and three defendants: Agri Stats, Tyson, and a JBS USA Food Company subsidiary. Similarly, this case and *Turkey* share nine firms representing plaintiffs, two plaintiffs' experts, and three defendants: Agri Stats, Tyson, and Hormel Foods.

Petitioner Agri Stats is the "one feature that crosses" all three actions. A3 (Jan. 31, 2023 Class Cert. Hr'g Tr. 182). Indeed, Respondents' counsel has argued that there are "not three conspiracies" but only "one conspiracy . . . centralized around Agri Stats." *Id.*

The United States and six states also sued Agri Stats, alleging that Agri Stats' benchmarking services in the broiler-chicken, pork, and turkey industries are unlawful information exchanges. *See* Second Am. Compl., *United States, et al. v. Agri Stats, Inc.*, No. 23-3009 (D. Minn. Nov. 15, 2023) ("*Agri Stats*"), ECF 50. *Agri Stats* was reassigned to Judge Tunheim because it is "related" to this case. *See Agri Stats* Order for Reassignment, ECF 15. Every processor Petitioner is an alleged co-conspirator in *Agri Stats*. *See Agri Stats* Second Am. Compl. ¶ 14, ECF 50. And the "full discovery records from *Broilers*, *Pork*, and *Turkey*" are part of the *Agri Stats* record. *United States v. Agri Stats, Inc.*, 2024 WL 3061570, at *5 (D. Minn. May 17, 2024). Indeed, the district court

Appellate Case: 25-3091     Page: 18     Date Filed: 10/17/2025 Entry ID: 5570117

subsequently denied Agri Stats' motion to transfer precisely because of the relatedness of the various Agri Stats matters, finding that "*Pork*, *Broilers*, *Turkey*, and this action all allege that Agri Stats participated in a price-fixing conspiracy and anticompetitive information exchange, such that there is overlap between all four actions." *United States v. Agri Stats, Inc.*, 2024 WL 2728450, at *4 (D. Minn. May 28, 2024).

### B. The Law Clerk's Work Experience and Social Media Activity.

The district court's law clerk has *three* different extrajudicial connections to this case: employment at one of Respondents' law firms, employment at a firm for plaintiffs in a related case, and an internship with the Minnesota Attorney General ("AG").

**Work on *Broilers*, *Turkey*, and *Beef* at Lockridge**. ███████, the law clerk worked as a summer associate at Respondents' firm, Lockridge Grindal Nauen PLLP ("Lockridge"), lead counsel for the direct-purchaser-plaintiff classes in *Pork*, *Broilers*, and *Turkey*. A24. While there, he worked on related Agri Stats cases *Broilers* and *Turkey,* as well as *In re Cattle & Beef Antitrust Litig.*, No. 22-md-3031 (D. Minn.) ("*Beef*"), another protein case before Judge Tunheim that began as an Agri Stats case. A49-50 (¶ 6); *see* Class Action Compl. 31, *Peterson v. Agri Stats, Inc.*,

9

No. 0:19-cv-01129 (D. Minn. Apr. 26, 2019), ECF 1 (alleging that Express Markets, an Agri Stats subsidiary, entered the beef market after Agri Stats' success "in the chicken and pork markets"). Neither Petitioners nor the public knows the information to which the clerk had access or the extent to which he was privy to litigation strategy discussions with Lockridge attorneys. Respondents refused to respond to Petitioners' questions on those points, ███████████████████████████████ ████, *see* A49-50 (¶ 6), and the district court refused to hold a sealed conference to discuss.

**Work at Another Antitrust Firm Litigating Protein and Agri Stats Cases**. ██████████████████████████, the law clerk worked at Robins Kaplan LLP, which litigates many antitrust cases against or involving Agri Stats, including: *Beef*, No. 22-md-3031 (D. Minn.); *In re Broiler Chicken Grower Litig. No. II*, No. 6:20-md-02977 (E.D. Okla.); and *Jien v. Perdue Farms, Inc.*, No. 1:19-cv-02521 (D. Md.). ███████████ ██████████████████████████████████████ A23-24.

**Work on *Agri Stats* at the Minnesota AG**. ███████████████ ██████████ the law clerk worked as an intern in the Minnesota AG's antitrust division. A18. ████████████████████████████████

10

███████████████ ██ ███ *Id.* As noted, Minnesota received all materials Petitioners produced in this case in *Agri Stats*. ████████████████████

████████████████████████████████████████ *Id.* It remains unclear what information and confidential documents the clerk may have accessed during his time there.

In the last three years, then, the law clerk has worked for three different employers litigating against Petitioners in formally or factually related antitrust cases (*Broilers*, *Turkey*, *Agri Stats*, and *Beef*).

**LinkedIn activity "celebrating" and "liking" antitrust announcements**. Even beyond his prior employment, the law clerk has also made social media posts—including *during his clerkship*—raising serious questions about his impartiality. For example:

- ████████████ a post about Minnesota's decision to join *Agri Stats* as a plaintiff. ████████████████████████████████ A27.

- ████████ a post by one of Respondents' counsel at Lockridge—within days of the *Daubert* motion hearing before the district court. ███████████████████ A31.

- ████████ another post by the same counsel ████████████████████████████████ A62; *see also* A61 ████████ post by then-Lockridge attorney describing six-week jury trial in *Broilers* as bid to █████████████████████████████

- ███████████ a Lockridge post recognizing that another of Respondents' counsel ████████████████████████████████████████████ ████████████████████████████████████████████ A57.

## C. The *Daubert* and Summary Judgment Rulings.

Petitioners filed *Daubert* challenges against six of Respondents' experts—and Respondents filed two of their own—which the district court heard on November 26, 2024. The law clerk was present, and upon conclusion of the hearing ████████████████████████████████ ██████. A6. That unusual encounter prompted Petitioners to investigate the clerk's potential conflicts.

Petitioners wrote to Lockridge on December 5, 2024, █████████ ████████████████████████████████████████. A33-38. Lockridge confirmed only that the clerk ██████████████████████████████ ████████████████████████████████████████████. A21.

On December 7, Petitioners wrote to the district court ███████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████ *See* A42. The court neither responded nor acknowledged the issue.

On February 13, 2025—two months after Petitioners first alerted the district court to the clerk's conflicts—certain Petitioners sought a sealed conference █████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████ A6. The district court again did not respond.

On March 31, 2025, and still without addressing the conflict issues, the district court denied Petitioners' *Daubert* and summary judgment motions. *See In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758 (D. Minn. 2025) (amended summary judgment order); *In re Pork Antitrust Litig.*, 2025 WL 965367 (D. Minn. Mar. 31, 2025) (*Daubert* order). The summary judgment opinion cited Respondents' experts 174 times. *See generally In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758.

**D.  The District Court Discloses the Law Clerk's Involvement After Issuing the *Daubert* and Summary Judgment Orders.**

More than four months after Petitioners first alerted the district court to the law clerk's apparent conflicts—and with *Daubert* and summary judgment behind it—the court denied Petitioners' request for a sealed conference ███████████████████████. A23-25. █████████

████████████████████████████████████████████████████████████████

13



A23-24.

A24.

A25 (emphasis added).

*Id.* (emphasis added).

### E. The District Court Denies Petitioners' Motion for Recusal.

On April 28, 2025, Petitioners moved for recusal and vacatur of the *Daubert* and summary judgment orders under 28 U.S.C. § 455. On October 7, 2025, the district court denied Petitioners' motion, concluding that the clerk's "work on this matter was within the ethical guidelines" and that "the clerk did not have a clear appearance of bias," and even if he had, "such bias should not be imputed to the Court." A67.

Appellate Case: 25-3091    Page: 24    Date Filed: 10/17/2025 Entry ID: 5570117

Concerning the law clerk's prior work with the Minnesota AG on *Agri Stats* and the resulting screen in this matter, the district court "strongly disagreed" that the screen effectively acknowledged an appearance of impropriety—despite its April 15 statement █████████ █████████████████████████████████████████ A25. The court instead claimed that the screen was to "shield the law clerk from further intrusive investigations and allegations of impropriety," A72, ████ ████████████████████████████. The court dismissed the clerk's prior work experience, noting the size and number of law firms involved in this matter, and the clerk's social media interactions with lawyers at those firms about related enforcement matters. The court concluded that the clerk did not technically practice law when working on related matters with Respondents' counsel, had only a "minimal level of expertise," and therefore did not gain "personal knowledge of facts concerning this proceeding." A68-71.

The district court further held that any conflict could not be imputed to it—despite case law so holding—because, in its (subjective) view, its *Daubert* and summary judgment opinions were not biased. The court also insisted the law clerk's work on the case was limited, and that

nothing suggested that the law clerk had provided biased input or otherwise affected the court's decisions. A72-74. The court further observed that the recusal effort appeared to be tactical because Petitioners sought recusal only after the court had issued its summary judgment rulings. A75.

Finally, the court declined to vacate its *Daubert* and summary judgment rulings, finding no risk of injustice given that both parties' experts were "of the highest quality" (though qualifications were not the basis for Petitioners' *Daubert* challenges) and seeking to avoid creating an incentive to "dig through more law clerks' personal lives" to "create the insinuation of a conflict" following an adverse ruling. *See* A76-77.

This petition follows.

## REASONS WHY THE WRIT SHOULD ISSUE

This Court will issue a writ of mandamus "when the district court has committed a clear error of law or abuse of discretion." *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 641 (8th Cir. 2001); *accord Apple, Inc.*, 602 F.3d at 911 (quoting *Cheney,* 542 U.S. at 380). The writ is warranted if the right to relief is "clear and indisputable"; "no other adequate means to attain the relief desired" exist; and "the writ is

16

appropriate under the circumstances." *In re Brazile*, 993 F.3d 593, 594 (8th Cir. 2021). The district court's clear and indisputable abuse of discretion in refusing to recuse and vacate its tainted rulings warrants mandamus.

## I. PETITIONERS HAVE A CLEAR AND INDISPUTABLE RIGHT TO THE WRIT.

Denial of a motion to recuse is reviewed for abuse of discretion, *United States v. Mims*, 122 F.4th 1021, 1033 (8th Cir. 2024); but "[a]n error of law is necessarily an abuse of discretion," *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1152 (8th Cir. 2013). "Considering together the mandamus standard and the abuse of discretion standard, the pivotal inquiry for determining whether [Petitioners] assert[] a clear and indisputable right to recusal" is whether the judge "abused his discretion by refusing to disqualify himself from this case." *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d 1353, 1358 (8th Cir. 1996) ("*KPERS*"). Because the district court abused its discretion here, Petitioners have a clear and indisputable right to a writ.

17

### A. The District Court Legally Erred and Clearly Abused Its Discretion in Finding that the Clerk's Substantive Participation in This Case Does Not Give Rise to an Appearance of Partiality.

1. "Unbiased, impartial adjudicators are the cornerstone of any system of justice worthy of the label." *In re Al-Nashiri*, 921 F.3d 224, 233–34 (D.C. Cir. 2019). Judges—and those assisting them in chambers—must avoid not only bias but even the appearance of it. Accordingly, 28 U.S.C. § 455(a) requires that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

This Court applies "an objective standard of reasonableness in determining whether recusal is required." *Oaks*, 606 F.3d at 536. "The question is whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." *Id.* (cleaned up). At its core, "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994).

The district court did not apply an objective standard here, however. Instead, its ruling rested on selective facts, a subjective assessment of whether the law clerk had shown actual bias, and its subjective view

18

of the clerk's character. Its analysis was legally erroneous and a clear abuse of discretion.

When evaluating the law clerk's work experience, the district court failed to acknowledge that it had already screened the clerk from working on the *same* alleged conspiracy among the *same* entities. ███████████ ███████████████████████████ █████████ █████████████ █████ ███████████████████████. A25. But if the clerk was conflicted out of *Agri Stats*, ████████████████████████, he necessarily has a conflict in this case, too.

Canon 3F(2)(a)(i) prohibits a law clerk from working on matters for which the clerk knows that he has "personal knowledge of disputed evidentiary facts concerning the proceeding." *Guide to Judiciary Policy*, Vol. 2, Pt. A, Ch. 3, Code of Conduct for Judicial Employees, Canon 3(F)(2)(a)(i) ("Code of Conduct"). The clerk worked on *Broilers*, *Turkey*, and *Agri Stats*—cases involving nearly identical allegations against Agri Stats. During the clerk's internship with the Minnesota AG, the office had access to either a complete or near-complete discovery record in *Pork*. *See Agri Stats* Memo. L. Supp. Mot. to Stay Disc. 10, ECF 101 ("Plaintiffs requested and received the full discovery records from *Broilers*, *Pork*, and

19

*Turkey*—which encompasses more than 30 million documents, terabytes of data, and over 600 fact witness deposition transcripts."). Put plainly, the clerk worked for an office acting as a plaintiff in a case with the same theories, alleged co-conspirators, and even record as this matter, then worked on substantive matters here. An "average person" aware of such facts would readily question the clerk's impartiality. *Oaks*, 606 F.3d at 536.

As for the law clerk's prior work at private law firms, "[t]he conflicts rules generally prohibit [a clerk] from working on any matter that was pending with his former firm while he worked there." Fed. Judicial Ctr., *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* 10 (2019 rev. 4th ed.) ("*Ethics*"). Code of Conduct Canon 3(F)(2)(a)(ii) similarly makes it an *actual* conflict for a law clerk to perform "any official duties" on any matter that the clerk knows that "a lawyer with whom he or she previously practiced law had served (during such association) as a lawyer concerning the matter." The district court nevertheless found dispositive that the clerk "was a law student at the time and was not licensed to practice law." A71. The fact that the clerk was not yet a lawyer when he worked at the firms does not cure the appearance of impropriety.

20

In fact, in *Ethics* (at 11), the lead example provided to clerks under its list of "Actual Conflicts" is: "In a previous legal job, you worked on a lawsuit now assigned to your judge."

During his work at Lockridge, the law clerk worked on *Broilers* and *Turkey*. His work on *Broilers* was even included in a fee petition in that case. *Broilers* Bruckner Decl., Ex. 19, ECF 7234-19 at 5. ██████████

██████████████████████████ ██ ████████████████████████

██████████████████████. *See* A23-24. The overlap between this case and *Beef*—and the experts in this case and *Beef*—is evinced by the *Beef* plaintiffs' recognition that the action was "the fifth protein antitrust case to reach the class certification stage," so "[t]he parties are not plowing new ground here in merits expert discovery." *Beef* Letter 2, ECF 1293 (citing, among others, *Broilers*, *Turkey*, and *Pork*).

████████████████████████████████████████

██████. A23-24. If the expert discovery here serves as groundwork for expert discovery in *Beef*, the adverse ruling on Petitioners' *Daubert* motions directly affects (and helps) Robins Kaplan's antitrust litigation against two of the *same* defendants. That creates an appearance of partiality.

21

The law clerk's many affiliations and connections to related cases should have precluded his involvement in this case. His employment history was enough for the district court to screen him from *Agri Stats* and *Beef*, and the court should have reached the same conclusion here—especially once Petitioners raised the issue. The clerk's work on closely related cases involving overlapping legal and factual issues, law firms, experts, and defendants gave him knowledge of litigation strategy at worst and the appearance of having this knowledge at best.

The district court eventually recognized as much, ███████████████ ████████████████████████████████████████████████ ████ A25. But for reasons never articulated, the court's October 7, 2025, order backtracks from its April order, asserting instead that the screen's purpose was only to "shield the law clerk from further intrusive investigations and allegations of impropriety." A72. This switch in rationale is itself a tell, as is the court's concession that it assigned the clerk to work on this case only because "the judge's other law clerks [were] unavailable." A73. That the court found the clerk to be "highly professional" is beside the point. A72. The inquiry is an objective assessment of the appearance of partiality, not a subjective assessment of professionalism.

2.     There is more. Before and even *during* his clerkship, the law clerk repeatedly interacted with Respondents' counsel on LinkedIn, ██ ███████████████████ their posts about *Broilers* and other antitrust litigation outcomes. *See* A27, A31, A57, A59, A61-62. He has ████████████ ██████ announcements about antitrust enforcement actions by Minnesota and the United States and, when announcing that he was joining the Minnesota AG's Office, ██████████████████████████████ ███████████████████ A28, A54-56, A60.

The district court concluded that these posts were either "irrelevant" or indications "merely that the law clerk continued to acknowledge and celebrate his classmates' and colleagues' successes." A69-70. This assessment, again, revolves around the clerk's subjective intent rather than the objective appearance of the posts. The mid-clerkship posts are especially concerning: "[a clerk] should not post online any comments about cases or legal issues that have come, or could come, before his court." *Ethics* 19; *see also id.* at 17 (warning that "your online activities can also pose a threat to multiple ethical obligations, including your responsibilities . . . to preserve the appearance of impartiality and the independence of the judiciary"). The clerk's posting while identifying himself as a

23

Judicial Law Clerk in the District of Minnesota gave the impression that "[t]he judicial branch of the government is . . . an advocate for private causes," *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1194 (8th Cir. 1984).

3. Petitioners would not be seeking this Court's intervention if the issue were "[t]he mere presence of [the clerk] in [ ] chambers." *United States v. Martinez*, 446 F.3d 878, 883 (8th Cir. 2006). This case does not concern a law clerk with no substantive "involvement whatsoever." *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 613 (8th Cir. 2003). Rather, the appearance of impropriety arises because he assisted the district court in addressing Petitioners' *Daubert* challenges to expert evidence that was cited repeatedly throughout the court's summary judgment order. *Cf. Martinez*, 446 F.3d at 883 (finding that an average observer would not reasonably question judge's impartiality when the screened clerk "performed only ministerial duties").

Even if "[a]ppearance may be all there is, [] that is enough." *United States v. Microsoft Corp.*, 253 F.3d 34, 115 (D.C. Cir. 2001). If the judge himself had engaged in this conduct, working for three separate sets of opposing counsel on related cases, appearing on a fee petition in a related case with many of the same parties, and repeatedly posting messages

24

during the case showing support for Respondents' side—the need for recusal would be beyond question. That the district court's law clerk engaged in this conduct does not meaningfully change the calculus when he has worked on the case. The Section 455(a) violation is "neither insubstantial nor excusable," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 867 (1988), and the court clearly abused its discretion in finding otherwise.

**B.** **The District Court Legally Erred and Clearly Abused Its Discretion by Concluding that Any Clerk Conflict Could Not Be Imputed to the Court.**

The district court further concluded that, "even if the clerk had an appearance of bias, such bias should not be imputed to the Court." A67. That is incorrect as a matter of law.

Courts consistently recognize that when a law clerk works on a case "in which his or her impartiality might reasonably be questioned . . . the clerk's actual or potential conflict may be imputed to the judge." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d at1311(citing *Hall v. Small Bus. Admin.*, 695 F.2d 175, 180 (5th Cir. 1983)); *see also, e.g.*, *In re Kensington Int'l Ltd.*, 368 F.3d 289, 308 (3d Cir. 2004) ("[T]here is an almost irrebuttable presumption that a judge is 'tainted' and must be disqualified

where, as here, he surrounds himself with individuals who may not be truly disinterested."); *United States v. Brocato*, 4 F.4th 296, 303 (5th Cir. 2021) ("[A] clerk is forbidden to do all that is prohibited to the judge." (citation omitted)); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1525 (11th Cir. 1988) (noting clerk's participation created appearance of partiality requiring judge's recusal).

The district court's ruling departs from this established law. It also sets a dangerous precedent that would eliminate the need for clerk conflicts rules because, as a categorical matter, any conflicts could not be imputed to the judge. That cannot be correct. This Court should grant the writ to make this point clear.

### C. The District Court's Failure to Disclose the Potential Conflicts Promptly Also Gives Rise to an Appearance of Partiality.

The district court's impartiality might reasonably be questioned for yet a separate reason: Despite Petitioners twice raising the issue before the court issued its decisions on the parties' *Daubert* and summary judgment motions, the court only acknowledged the clerk's conflicts *after* ruling on those motions. Judges must "carefully examine possible grounds for disqualification and [] promptly disclose them when discovered."

26

*Liljeberg*, 486 U.S. at 868. For this reason, "[a] judge's lack of candor about potential grounds for recusal can of course produce an appearance of partiality." *In re Hawsawi*, 955 F.3d 152, 162 (D.C. Cir. 2020). Indeed, this Court has noted that a district court's "failure to disclose [a] conflict" is "particularly worrisome." *Moran v. Clarke*, 296 F.3d 638, 649 (8th Cir. 2002), *abrogated on other grounds by Manuel v. City of Joliet*, 580 U.S. 357 (2017).

This is not a case of "harmless error committed by [a] busy judge[] who inadvertently overlook[ed] a disqualifying circumstance." *Liljeberg*, 486 U.S. at 862. Petitioners raised their concerns about the law clerk with the district court in December 2024 and February 2025, having had no basis to raise them earlier. Yet the court did not respond until *April*, when it finally acknowledged—and ultimately trivialized—the clerk's appearance of partiality. At best, the court's failure to disclose the conflict earlier is not "consistent with the duty to avoid the appearance of impartiality." *First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 989 (9th Cir. 2000).

Appellate Case: 25-3091     Page: 37     Date Filed: 10/17/2025 Entry ID: 5570117

## II. PETITIONERS HAVE NO OTHER ADEQUATE MEANS TO ATTAIN THE RELIEF FROM THE APPEARANCE OF PARTIALITY.

Petitioners have "no other adequate means to attain the relief desired." *Brazile*, 993 F.3d at 594. This is because "no amount of appellate review can remove completely the stain of judicial bias." *Al-Nashiri*, 921 F.3d at 238. Indeed, "the appeal itself may be tainted" because "the judge whose recusal is sought has compiled the record being reviewed by the court of appeals." *In re Creech*, 119 F.4th 1114, 1125 (9th Cir. 2024). Waiting for review until after trial therefore is not an adequate remedy for this Section 455 violation—for the parties or for the legal system at large. That is why this Court and others "have uniformly acknowledged that mandamus can be an appropriate vehicle for seeking recusal so long as its demanding standard is satisfied." *Id.* at 1120 (citing, among other cases, this Court's decision in *KPERS*, 85 F.3d at 1348); *see also, e.g.*, *Liddell v. Bd. of Ed. of City of St. Louis*, 677 F.2d 626, 643 (8th Cir. 1982); *Pfizer Inc. v. Lord*, 456 F.2d 532, 537 (8th Cir. 1972).

At its core, "[w]hen the relief sought is recusal of a disqualified judicial officer, the injury suffered by a party required to complete judicial proceedings overseen by that officer is by its nature irreparable."

Appellate Case: 25-3091     Page: 38     Date Filed: 10/17/2025 Entry ID: 5570117

*Al-Nashiri*, 921 F.3d at 238. "The same is true for proceedings in which the disqualified adjudicator is gone"—here, the clerk—"but his orders remain." *Id.* If an adjudicator "should have been recused from the . . . proceedings, then any work produced" by that adjudicator "must also be 'recused'—that is, suppressed." *In re Brooks*, 383 F.3d 1036, 1044 (D.C. Cir. 2004). Petitioners thus have "no adequate remedy . . . other than to scrub [the tainted] orders from the case at the earliest opportunity." *Al-Nashiri*, 921 F.3d at 238.

Failing to fix immediately the appearance of partiality also "inflicts an institutional injury on the judiciary that is not correctable through the normal appellate process." *Creech*, 119 F.4th at 1125; *accord Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 163 (3d Cir. 1993) (appellate review "cannot cure the additional, separable harm to public confidence that section 455 is designed to prevent"); *Al-Nashiri*, 921 F.3d at 238. On this basis, courts should resolve recusal issues as early as possible—not long after the appearance of bias surfaces. *See, e.g.*, *In re Bergeron*, 636 F.3d 882, 884 (7th Cir. 2011) ("[T]he cleanest remedy against the creation of an appearance of judicial bias is to seek the judge's removal as soon as the appearance materializes, hopefully before trial."); *Cochran v. SEC*,

29

20 F.4th 194, 212 (5th Cir. 2021) ("Given that disqualification disputes concern the basic integrity of a tribunal, they must be resolved at the outset of the litigation."); *In re United States*, 666 F.2d 690, 694 (1st Cir. 1981) ("Public confidence in the courts requires that [bias] question[s] be disposed of at the earliest possible opportunity." (cleaned up)). Now is the time "to take the steps necessary to maintain public confidence in the impartiality of the judiciary" before this harm tarnishes these proceedings for good. *Liljeberg*, 486 U.S. at 861.

Mandamus relief is "especially warranted" when, as here, "the stakes of the litigation are unusually significant." *In re Landry*, 83 F.4th 300, 308 (5th Cir. 2023) (Ho, J., concurring); *see, e.g.*, *Abelesz v. OTP Bank*, 692 F.3d 638, 651 (7th Cir. 2012) (granting mandamus relief to compel dismissal of case involving "astronomical" "financial stakes"). Respondents collectively seek damages of over *$30 billion*, threatening devastating consequences for the pork industry. It is thus no coincidence that several defendants settled with certain plaintiffs shortly after the *Daubert* and summary judgment motions were denied. *See Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298 (7th Cir. 1995) (granting mandamus, in part, because erroneous orders in cases with massive "potential

30

liability" place defendants "under intense pressure to settle"). Put simply, if any case warrants mandamus relief, this case is near the top of the list.

## III.   A WRIT IS APPROPRIATE UNDER THE CIRCUMSTANCES.

"[I]f the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *In re Mo. Dep't of Corr.*, 839 F.3d 732, 735 (8th Cir. 2016) (citing *Cheney*, 542 U.S. at 381). A writ is appropriate here because there are "few situations more appropriate for mandamus than a judge's clearly wrongful refusal to disqualify himself." *In re Int'l Bus. Machs. Corp.*, 618 F.2d 923, 926 (2d Cir. 1980) (citation omitted); *see also, e.g.*, *Liddell*, 677 F.2d at 643; *Pfizer Inc*, 456 F.2d at 537. The right to grant mandamus to remedy a judge's refusal to recuse himself is "settled" and thus "appropriate under the circumstances." *In re Borowiak IGA Foodliner, Inc.*, 879 F.3d 848, 850 (8th Cir. 2018) (applying rationale to the improperly denied right to jury trial).

## IV.   THE DISTRICT COURT CLEARLY ABUSED ITS DISCRETION IN REFUSING TO RECUSE AND VACATE THE *DAUBERT* AND SUMMARY JUDGMENT ORDERS.

The Supreme Court instructs courts to consider three factors when deciding whether to vacate an order to remedy a Section 455(a) violation:

31

(1) "the risk of injustice to the parties in the particular case"; (2) "the risk that the denial of relief will produce injustice in other cases"; and (3) "the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. Each factor confirms that recusal and vacatur are the proper remedies here.

*First*, there is a substantial risk of injustice if the district court's *Daubert* and summary judgment rulings stand. "[T]he first factor militates in favor of vacatur" when "the district judge's impartiality towards the parties may reasonably be questioned based on th[e] appearance" of partiality. *Litovich v. Bank of Am. Corp.*, 106 F.4th 218, 227 (2d Cir. 2024). As detailed, the law clerk's substantive work on overlapping cases (*Broilers*, *Turkey*, *Agri Stats*, and *Beef*), social media activity, and seeming violation of Canon 3F(2)(a) would lead a reasonable person to seriously question whether the deliberative process was infected with improper influence.

Despite the district court's assurance that the clerk ███████████ ███████████████████████████ A25, the goal of Section 455(a) "is to exact the appearance of impartiality," so it is immaterial "[w]hether or not the law clerk actually affected the [judge's] decision," *Hall*, 695

F.2d at 179. Indeed, "[t]he difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883 (2009).

*Second*, the conflict here—allowing law clerks to work on matters when they have worked on closely related litigation and publicly expressed opinions favoring one side of the "v."—presents a risk of injustice in other cases. To be sure, "cases are decided by judges, not law clerks." *O'Bannon v. Union Pac. R. Co.*, 169 F.3d 1088, 1091-92 (8th Cir. 1999). But "[l]aw clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision." *Hall*, 695 F.2d at 179. By enforcing Section 455(a) here, the Court can "prevent a substantive injustice in some future case" by instructing district courts "to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered." *Liljeberg*, 486 U.S. at 868. On the other hand, allowing the rulings to stand "may increase the likelihood that conflicts go unnoticed and unremedied." *Litovich*, 106 F.4th at 227 (cleaned up).

The specific orders at issue also present a risk of injustice in related cases. Because this is one of several antitrust cases involving other proteins, Agri Stats, or both—including two cases pending before the same district judge precisely because of their relationship to this case—these tainted rulings could have a persuasive if not "preclusive or prejudicial effect" on those related cases. *Shell Oil Co. v. United States*, 672 F.3d 1283, 1293 (Fed. Cir. 2012). That concern is not theoretical. In *Agri Stats*, the defendant's *Daubert* motion raises issues identical to those the district court addressed in *Pork* with the clerk's assistance. The clerk's work, therefore, has direct application to a case in which he was screened. In fact, plaintiffs in these related cases intend as much. *See, e.g.*, *Beef* Letter at 2, ECF 1293 ("The parties are not plowing new ground here in merits expert discovery."). Other litigants should not be handicapped by decisions compromised by an appearance of impropriety.

*Third*, the need to protect the "public's confidence" in the judicial process—"an interest of the highest order"—demands relief. *Wersal v. Sexton*, 674 F.3d 1010, 1022 n.8 (8th Cir. 2012); *see Liljeberg*, 486 U.S. at 865 ("The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible.").

Anything less than scrupulous conduct from judges "demeans the repu-
tation and integrity not just of one jurist, but of the larger institution of
which he or she is a part." *Williams v. Pennsylvania*, 579 U.S. 1, 15
(2016). Even were this Court confident that no bias affected the *Daubert*
or summary judgment orders, or would affect the outcome of this or any
other case, the appearance of impropriety would persist. That concern is
pronounced here, given the significant "media coverage" of the Section
455(a) violation.[2] *Litovich*, 106 F.4th at 227. At bottom, "justice must sat-
isfy the appearance of justice." *Liljeberg*, 486 U.S. at 864 (cleaned up).
And the best—or rather only—way to safeguard this appearance is for
the Court to vacate the orders and "allow[] a new judge to take a fresh
look at the issues." *Id.* at 868.

That the clerk was screened from the case in April 2025 ██████
█████ did not obviate the need to vacate the tainted orders. *See* A25.
While screening a conflicted law clerk *before* the clerk works on a case

---

[2] *See, e.g.*, Jared Foretek, *Pork Producers Want Ruling Tossed Over
Clerk's Conduct*, Law360 (April 29, 2025), https://bit.ly/4j0xiuA; Bryan
Koenig, *Price-Fixing Judge Rejects Recusal Bid As Insincere*, Law360
(Oct. 7, 2025), https://www.law360.com/articles/2351516; Katie Arcieri,
*Judge Rejects Recusal Bid Over Clerk Courtroom Hug in Pork Case*,
Bloomberg Law (Oct. 7, 2025), https://tinyurl.com/6e435225.

Appellate Case: 25-3091     Page: 45     Date Filed: 10/17/2025 Entry ID: 5570117

typically avoids any appearance issues and does not require a judge's recusal, *see, e.g.*, *Trammel*, 345 F.3d at 613; *Martinez*, 446 F.3d at 883, screening is prophylactic, not remedial. Here, screening the clerk's *future* participation did not cleanse the tainted *Daubert* and summary judgment orders. The only way to fix the *past* appearance of impropriety—an appearance that will persist until remedied—is for the Court to vacate the orders.

## CONCLUSION

This Court should grant a writ of mandamus, direct the district judge to recuse himself from this case, vacate the *Daubert* and summary judgment orders, and reassign the motions for *de novo* review and decision by a new district judge.

Dated: October 16, 2025

Respectfully submitted,

*/s/ William L. Monts III*

WILLIAM L. MONTS III
JUSTIN W. BERNICK
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
justin.bernick@hoganlovells.com
william.monts@hoganlovells.com

*Counsel for Agri Stats, Inc.*

36

/s/ Daniel Laytin

DANIEL LAYTIN, P.C.
CHRISTA COTTRELL, P.C.
JENNA STUPAR
NICHOLAS M. RUGE
AMARTO BHATTACHARYYA
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
(312) 861-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com
jenna.stupar@kirkland.com
nicholas.ruge@kirkland.com
amarto.bhattacharyya
@kirkland.com

*Counsel for Clemens Food Group, LLC and The Clemens Family Corporation*

/s/ Peter Schwingler

PETER J. SCHWINGLER
KELLY HOLT RODRIGUEZ
TESS L. ERICKSON
JONES DAY
90 South Seventh Street,
Suite 4950
Minneapolis, MN 55402
(612) 217-8866
pschwingler@jonesday.com
kholt@jonesday.com
terickson@jonesday.com

WILLIAM L. GREENE
WILLIAM D. THOMSON
STINSON LLP
50 South Sixth Street,
Suite 2600
Minneapolis, MN 55402
(612) 335-1500
william.greene@stinson.com
william.thomson@stinson.com

J. NICCI WARR
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
(314) 863-0800
nicci.warr@stinson.com

*Counsel for Seaboard Foods LLC*

37

/s/ Brian Robison

BRIAN ROBISON
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, TX 75034
(972) 707-1809
brian@brownfoxlaw.com

JOHN A. COTTER
JOHN A. KVINGE
LARKIN HOFFMAN DALY &
  LINDGREN LTD.
8300 Norman Center Drive,
Suite 1000
Minneapolis, MN 55427-1060
(952) 835-3800
jcotter@larkinhoffman.com
jkvinge@larkinhoffman.com

RICHARD PARKER
MILBANK LLP
1101 New York Avenue, NW
Washington, DC 20005
(202) 835-7530
rparker@milbank.com

JOSH LIPTON
GIBSON, DUNN & CRUTCHER, LLP
1700 M Street, NW
Washington, DC 20036-4504
(202) 955-8500
jlipton@gibsondunn.com

*Counsel for Smithfield Foods, Inc.*

/s/ Michael T. Raupp

MICHAEL T. RAUPP
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000
michael.raupp
@huschblackwell.com

CHRISTOPHER A. SMITH
JASON HUSGEN
HUSCH BLACKWELL LLP
8001 Forsyth Blvd., Suite 1500
St. Louis, MO 63105
Chris.smith@huschblackwell.com
Jason.husgen
@huschblackwell.com

A. JAMES SPUNG
HUSCH BLACKWELL LLP
1801 Wewatta Ave., Suite 1000
Denver, CO 80202
James.spung
@huschblackwell.com

DANIEL G. SOLOMON
HUSCH BLACKWELL LLP
1801 Pennsylvania Ave., NW,
Suite 1000
Washington, DC 20006
Danny.solomon
@huschblackwell.com

*Counsel for Triumph Foods, LLC*

38

*/s/ Mary Helen Wimberly*

TIFFANY RIDER ROHRBAUGH
MARY HELEN WIMBERLY
LINDSEY STRANG ABERG
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
(202) 912-4700
trider@axinn.com
mhwimberly@axinn.com
lstrang@axinn.com

DENISE L. PLUNKETT
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
(212) 728-2200
dplunkett@axinn.com

JAROD TAYLOR
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
(860) 275-8109
jtaylor@axinn.com

SCOTT M. RUSERT
A. CHRISTOPHER BROWN
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2210
SRusert@taftlaw.com
CBrown@taftlaw.com

*Counsel for Tyson Foods, Inc.;*
*Tyson Prepared Foods, Inc.; and*
*Tyson Fresh Meats, Inc.*

39